Filed 9/24/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| DANIEL ORTEGA,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>     Respondent;<br><br>THE PEOPLE,<br><br>     Real Party in Interest. | A156464<br><br>(Contra Costa County<br>Super. Ct. No. 51706514) |

Daniel Ortega (petitioner) seeks a writ of prohibition from an order denying his motion to set aside the murder count in the indictment filed against him and two co-defendants. (Pen. Code, § 995.)[1] He contends he was indicted on less than probable cause because the grand jury heard evidence and received instructions on two theories of murder that were subsequently invalidated under Senate Bill 1437. (Stats. 2018, ch. 1015, §§ 1–3.) We conclude that because the evidence and instructions supported petitioner's indictment on a still-valid theory of murder, the motion under section 995 was properly denied.

## I. BACKGROUND

As relevant here, the evidence presented to the grand jury was as follows:

On the night of November 11–12, 2016, petitioner went with Dena Herrera to the Capri Club bar in El Sobrante, driving petitioner's car. Also present in the bar were

---

[1]     Unless otherwise noted, further statutory references are to the Penal Code.

1

co-defendants Daniel Porter-Kelly and Ray Gonzalez Simons, both of whom petitioner knew. Surveillance cameras showed that Simons told petitioner something to the effect of, "Hey, you know what? I just bought a little-ass pistol and I am going to put (unintelligible) in this mother fucker." Later, victim William Sims walked into the bar.

After the bartender announced last call, petitioner went out the back door of the bar to a patio with Simons and Herrera. Sims and Porter-Kelly remained inside, and when Sims hugged a woman in the bar, Porter-Kelly said, "Fuck that nigger."[2] He also said, "That nigger is trippin' " and "Oh, he's pimpin.' " Porter-Kelly left through the back door and Sims followed.

Herrera began talking to Sims, with whom she had had a friendly conversation in the bar, and Porter-Kelly walked over to them. Sims extended his hand for Porter-Kelly to shake, but Porter-Kelly gave him a dirty look and refused. Petitioner walked over and reluctantly shook Sims's hand at Herrera's insistence. Simons approached and asked Sims if he wanted to buy some cocaine, to which Sims replied that he only had one dollar. Simons told him they would see what they could do and all four men walked to a different area of the patio.

Petitioner dropped his cell phone and punched Sims in the face.[3] Sims was knocked to the ground and Herrera saw petitioner, Porter-Kelly and Simons kick and punch him all over. Herrera tried to stop the beating, but petitioner told her not to interfere. She then tried to leave before the beating was over, by driving away in petitioner's car.

Herrera started the car and started backing slowly down the driveway next to the bar. Petitioner ran up to the car, sat down in the front passenger seat, and said, "Bitch, drive." Simons then came up to the car with a wallet in his hands and said, "There's

---

[2]      Sims was African-American. Petitioner and co-defendants are not.

[3]      According to a statement given by petitioner to police, Sims "aggressively approached" petitioner after walking away from a verbal argument with Porter-Kelly. Sims was 5' 6" and weighed 140-160 pounds; Porter-Kelly was between 6' and 6' 2" and weighed 290 pounds; Simons was about the same height as Porter-Kelly.

nothing in here but a dollar and some swipers" (meaning credit cards). Petitioner told him he needed to get rid of the wallet and Simons entered the car and sat in the back passenger side seat.

Herrera finished backing the car down the driveway and when she pulled into the street in front of the bar, Sims ran up and put his hands on the car. He yelled something but Herrera could not recall what he said. Simons fired two shots. Herrera drove away and petitioner told her, "I know you are going to snitch, bitch." Simons said she wouldn't tell because they knew where her family lived.

Sims was fatally shot in the head. The injuries from the beating he received at the hands of petitioner and co-defendants were consistent with a "pistol-whipping," and were severe enough that had he not been shot, they could have been fatal. Sims may also have survived the beating had he not been shot—the coroner who conducted the autopsy could not tell.

Based on this evidence, the prosecutor gave written instructions to the grand jury on aiding and abetting, aiding and abetting under a natural and probable consequences theory, and the felony murder rule, as well as the general principles of homicide, murder with malice aforethought, robbery, and assault with force likely to produce great bodily injury. He also read these instructions verbally.

On April 17, 2017, the grand jury returned an indictment accusing petitioner of murder, second degree robbery and assault by means of force likely to produce great bodily injury. (§§ 187, subd. (a), 211, 245, subd. (a)(4).) The grand jury rejected a hate crime allegation (§ 422.75, subd. (b)) and special circumstance allegations that the victim had been killed because of his race and pursuant to a felony murder. (§ 190.2, subds. (a)(16), (a)(17).) Co-defendant Porter-Kelly was indicted on the same charges. Co-defendant Simons was also indicted on the same charges, and was additionally indicted for one count of possession of a firearm by a felon (§ 29800, subdivision (a)(1)), for firearm enhancements in connection with the murder and robbery counts (§ 12022.53, subds. (b)–(e)), for a felony-murder (robbery) special circumstance in connection with the murder count (§ 190.2, subdivision (a)(17)), and for suffering a prior serious and/or

3

violent felony conviction within the meaning of the three strikes law and the prior serious felony enhancement provision (§ 667, subd. (a)(1), (d)–(e), 1170.12).

On September 30, 2018, the governor signed Senate Bill 1437, effective January 1, 2019.  Petitioner moved to set aside the indictment on multiple grounds, including that he had been indicted under the natural and probable consequences doctrine or the felony-murder rule, which were now-invalid theories of murder absent certain findings not made by the grand jury.  (§ 995.)

The court denied the motion, finding the evidence sufficient to entertain a strong suspicion that petitioner specifically intended to aid in the murder of Sims by coordinating ahead of time with Simons, by participating in the potentially fatal beating, and by assisting Simons in fleeing after the fatal shot was fired but before Sims actually died.  The court noted the grand jury had received instructions on direct aiding and abetting.  Petitioner timely sought a writ of prohibition under section 999a and has demonstrated the availability of review under section 1510.

## II.  DISCUSSION

### A.  *General Principles and Standard of Review*

The prosecution may initiate felony criminal charges against a defendant either by filing a complaint before a magistrate and holding a preliminary hearing or by securing a grand jury indictment.  (Cal. Const., art. I, § 14; § 737–740, 889, 939.8, 949.)  Both types of proceedings are designed to determine whether sufficient evidence has been presented to hold a defendant to answer on a criminal complaint.  (*Stark v. Superior Court* (2011) 52 Cal.4th 368, 406 (*Stark*); *Cummiskey v. Superior Court* (1992) 3 Cal.4th 1018, 1027 (*Cummiskey*).)  The standard of proof is probable cause, which is a less stringent standard than the burden of proof beyond a reasonable doubt standard at trial.  (*Cummiskey* at pp. 1027–1029; *People v. Casillas* (2001) 92 Cal.App.4th 171, 178.)  Probable cause means " 'such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a strong suspicion of the guilt of the accused. . . .[P]robable cause may exist although there may be some room for doubt.' " (*Garcia v. Superior Court* (2009) 177 Cal.App.4th 803, 818, quoting *Cummiskey*, at

4

p. 1029.) In assessing the sufficiency of a showing of probable case, we ask whether " 'a public offense has been committed, and there is sufficient cause to believe the defendant guilty thereof.' " (*Cummiskey*, at pp. 1026–1027.)

When the prosecution elects to proceed by indictment, "it is the grand jury's function to determine whether probable cause exists to accuse a defendant of a particular crime. In other words, the grand jury serves as part of *the charging process* of a criminal procedure, not *the adjudicative process* that is the province of the courts or trial jury." (*Cummiskey*, *supra*, 3 Cal.4th at p. 1026.) "[A] defendant has a due process right not to be indicted in the absence of a determination of probable cause by a grand jury acting independently and impartially in its protective role." (*People v. Superior Court (Mouchaorab)* (2000) 78 Cal.App.4th 403, 424; see also *People v. Backus* (1979) 23 Cal.3d 360, 392–393.)

Section 995, subdivision (a)(1) permits the court to set aside an indictment "(A) Where it is not found, endorsed, and presented as prescribed in this code" or "(B) . . . the defendant has been indicted without reasonable or probable case." Although the prosecution does not have the duty to instruct a grand jury on the law in the same manner that a trial judge must instruct a petit jury (*Cummiskey*, *supra*, 3 Cal.4th at p. 1034), a claim that the grand jury was misinstructed "may be tantamount to a claim that, as instructed, the [grand] jury may have indicted [the defendant] on less than reasonable or probable cause." (*Id*. at p. 1022, fn. 1; *People v. Gnass* (2002) 101 Cal.App.4th 1271, 1310 & 1314.) A motion to set aside the indictment under section 995 accordingly may be based on a claim that the grand jury was not given correct instructions on the burden of proof (*Cummiskey* at p. 1022, fn. 1) or that the instructions given omitted or misstated an essential element of the offense charged (*Stark*, *supra*, 52 Cal.4th 407; *Gnass* at pp. 1310–1314).

If the motion is denied, the defendant may seek review via a writ of prohibition. (§ 999a.) On review, we consider whether substantial evidence supports the decision of the grand jury in holding the defendant to answer the charges. (*People v. Davis* (2010) 184 Cal.App.4th 305, 311.) All presumptions are in support of that decision. (*Ibid*.)

5

" '[A]n indictment will not be set aside if there is some rational ground for assuming the probability that an offense has been committed and the accused is guilty of it.' " (*People v. Pic'l* (1982) 31 Cal.3d 731, 737.)

    B.  *Senate Bill 1437*

        Petitioner and his co-defendants were indicted in 2017. At that time, there were three ways in which a person could be convicted of murder based on a killing committed by another person under aiding and abetting principles. First, he or she might be convicted under a direct aiding and abetting theory. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118 (*McCoy*); see also *People v. Chiu* (2014) 59 Cal.4th 155, 158, 166–167 (*Chiu*).)[4] " 'Second, under the natural and probable consequences doctrine, an aider and abettor [was] guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chiu* at p. 158.) Third, " ' "[u]nder the felony-murder doctrine, when the defendant or an accomplice kill[ed] someone during the commission, or attempted commission, of an inherently dangerous felony, the defendant [was] liable for either first or second degree murder, depending on the felony committed. If the felony is listed in section 189, the murder [was] of the first degree; if not, the murder [was] of the second degree." ' " (*People v. Powell* (2018) 5 Cal.5th 921, 942.) A person who aided and abetted in the commission of the underlying felony could be liable for a felony murder committed by a cohort, at least when there was a logical nexus between the felony and the act resulting in death. (*People v. Cavitt* (2004) 33 Cal.4th 187, 196–206.)

        While this case was awaiting trial, Senate Bill 1437 was signed into law, effective January 1, 2019, to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not

---

[4]    When a conviction is based on this type of "direct" aiding and abetting, the degree of the murder will be dependent on the defendant's own personal mental state, and may be either greater or lesser than the degree of the murder committed by the perpetrator. (*McCoy*, *supra*, 25 Cal.4th at p. 1122; *People v. Loza* (2012) 207 Cal.App.4th 332, 351–352.)

imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) "Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723 (*Martinez*).) The changes to these subdivisions appear to eliminate the second degree felony-murder rule in addition to limiting the first degree felony-murder rule. (*In re White* (2019) 34 Cal.App.5th 933, 937, fn. 2; *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1142, fn. 3.)

Senate Bill 1437 added section 188, subdivision (a)(3), which provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." Express malice is defined in section 188, subdivision (a)(1) as "a deliberate intention to unlawfully take away the life of a fellow creature." Implied malice is defined under section 188, subdivision (a)(2) as existing "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart." This definition of implied malice, which is "quite vague," has been judicially construed to have " 'both a physical and a mental component. The physical component is satisfied by the performance of "an act, the natural consequences of which are dangerous to life." [Citation.] The mental component is the requirement that the defendant "knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." ' " (*People v. Chun* (2009) 45 Cal.4th 1172, 1181.)

Senate Bill 1437 also amends section 189 to add subdivision (e), which provides, "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first

7

degree.  [¶]  (3) *The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.*" (Italics added.)[5]

C.  *Analysis*

Sims was killed by a gunshot wound that the evidence shows was inflicted by co-defendant Simons.  There is no evidence that petitioner fired the fatal bullet.  Petitioner argues that even though the grand jury was properly instructed on the natural and probable consequences doctrine and the felony murder rule as those doctrines existed at the time, after Senate Bill 1437 he could no longer be convicted of murder under those theories.  He contends that the People relied on these now-invalid theories in their instructions and arguments before the grand jury, and that because the grand jury likely relied on one or both of these theories, there was no probable cause to support the indictment.  Petitioner further argues that in denying the motion under section 995, the court erroneously reweighed the evidence and upheld the indictment based on a theory of direct aiding and abetting that was not presented to or considered by the grand jury.  We disagree.

We begin by noting that the evidence presented to the grand jury was sufficient to support a finding of probable cause to believe petitioner committed murder based on the still-valid theory of *direct* aiding and abetting as well as a finding he personally acted with malice aforethought.  He participated in a potentially fatal beating of Sims shortly before Sims was shot by Simons, knowing Simons was carrying a gun.  Although petitioner was free to argue that he only harbored an intent to assault Sims and to assist Simons and Porter-Kelly in that assault, a reasonable trier of fact could conclude that given the extent of the injuries to Sims, petitioner intended the attack to be fatal or knew

---

[5]     Senate Bill 1437 also created section 1170.95, which establishes a procedure for defendants *convicted* of felony murder or murder under a natural and probable consequences theory to petition for relief under the new law.  That provision is not at issue here as petitioner has not been convicted of any crime.  (See *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1147 (*Anthony*).)

his conduct and that of his cohorts was dangerous to human life and committed in conscious disregard of human life.  (*People v. Johnson* (2016) 243 Cal.App.4th 1247, 1287 [defendants could have been convicted on theory they aided and abetted an attempted robbery in which the direct perpetrators acted with implied malice]; *People v. Guillen* (2014) 227 Cal.App.4th 934, 982–998 [each defendant's participation in group attack on incarcerated child molester sufficient to prove he acted with implied malice]; *People v. Woods* (1991) 226 Cal.App.3d 1037, 1047–1048 [sufficient evidence to support second degree murder conviction based on gang-related group attack].)  Had Simons shot Sims during the beating itself, we would have no difficulty concluding that petitioner was potentially liable for his murder as a direct aider and abettor or that sufficient evidence was presented to supply probable case that he personally harbored malice aforethought; the result is not different, as a matter of law, simply because Simons pulled the trigger when he was fleeing the scene in petitioner's car a few minutes later, rather than during the attack itself.

Not only was the evidence sufficient to establish probable cause that petitioner personally harbored malice and was guilty of murder under a direct aiding and abetting theory, the grand jury was instructed on those principles.  It was given modified versions of CALCRIM No. 400 [Aiding and Abetting: General Principles]; No. 401 [Aiding and Abetting: Intended Crimes]; No. 500 [Homicide: General Principles]; No. 520 [Murder with Malice Aforethought (Pen. Code, § 187)].  Although the prosecutor argued the natural and probable consequences theory and the felony murder rule, he also told the grand jury about aiding and abetting generally:  "As far as how other individuals can be held responsible for the actions of others, the law that I read to you talks about a couple of principles.  One is aiding and abetting.  And again, if there's any discrepancy from what I say and the law that I have read to you, the law that I read to you is what governs.  But under aiding and abetting, someone who assists someone in a crime is guilty of that crime as well.  The classic example is bank robbery.  Obviously, this isn't a bank robbery.  But a Grand Jury could indict someone if there's a group of people that all get together to do a bank robbery.  One person is the lookout, one person is the driver, one

9

person goes in and actually robs the bank. One person actually does it. All three can be found guilty of being indicted under the aiding and abetting theory. They assisted in the crime itself. That's aiding and abetting."

An indictment must be supported by probable cause, namely, " ' "such a state of facts as would lead a [person] of ordinary caution or prudence to believe, and conscientiously entertain a *strong suspicion* of the guilt of the accused." (*Cummiskey*, *supra*, 3 Cal.4th at p. 1029.) At the time the grand jury returned the indictment for murder against petitioner, there was ample probable cause to support this charge under each of the theories presented to the grand jury: direct aiding and abetting, the natural and probable consequences doctrine and the felony murder rule. However, the law changed in the interim. The parties do not appear to dispute that Senate Bill 1437 applies to this case going forward.[6] (*Anthony*, *supra*, 32 Cal.App.5th at p. 1147.) Petitioner argues that due to the change in the law, probable cause no longer supports the indictment, because he may have been charged under what are now invalid theories of murder under the natural and probable consequences doctrine and felony murder rule.

If the only evidence presented to the grand jury showed guilt under a now-invalid theory, or if the grand jury had been instructed exclusively on a now-invalid theory, we would agree with petitioner that the indictment was not supported by probable cause. In a case where the evidence was limited to the invalid theory, there would be no probable cause to believe that appellant had committed an act that qualified as murder. And, in the

---

[6] The decision in *In re Estrada* (1965) 63 Cal.2d 740, 744 "stands for the proposition that, in the absence of a savings clause or some other indication of legislative intent to the contrary, when a criminal statute is amended to reduce the possible punishment for a prohibited act, the defendant in any case not yet final is entitled to the benefit of the lower punishment." (*Henry v. Municipal Court* (1985) 171 Cal.App.3d 721, 724.) Although courts have held that aiders and abettors who have been *convicted* of murder under the natural and probable consequences doctrine or felony murder rule must seek relief under section 1170.95 rather than raising the issue on direct appeal (*Martinez*, *supra*, 31 Cal.App.5th at pp. 727–728), application of Senate Bill 1437 to petitioner's case, which has not yet been tried, means that the case submitted to the petit jury—the instructions given, the argument made by the prosecutor, the evidence presented—must conform with the amendments.

absence of instructions on a valid theory, it would be impossible to assume the grand jury found probable cause that murder had been committed even if evidence supporting the charge had been submitted. (Cf. *Gnass*, *supra* 101 Cal.App.4th at p. 1309 [indictment should have been set aside when grand jury not instructed on essential elements of offense].)

Here, however, the evidence was sufficient to support a finding of probable cause under the still-valid theory of direct aiding and abetting with malice. It also received instructions on that theory. Murder is a single charge even if it can be based on distinct legal theories, and an accusatory pleading need not specify the theory of murder on which the prosecution intends to rely. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 479; *People v. Benavides* (2005) 35 Cal.4th 69, 101; *People v. Davis* (1995) 10 Cal.4th 463, 514; *People v. Santamaria* (1994) 8 Cal.4th 903, 918–919; *People v. Hughes* (2002) 27 Cal.4th 287, 369–370.) "[A]n accused is given sufficient notice of the theory by the evidence adduced in the preliminary examination (or the grand jury proceedings if the People proceed by way of indictment)." (*People v. Gurule* (2002) 28 Cal.4th 557, 629 Here, petitioner knew he was being charged with murder, and he would be given sufficient notice of any type of murder shown by the evidence, argued by the prosecutor and instructed upon. While "[a]n indictment or accusation cannot be amended so as to change the offense charged" (§ 1009; *Owen v. Superior Court* (1976) 54 Cal.App.3d 928, 932), here the limitation of permissible murder theories going forward does not "change" the offense charged or otherwise purport to amend the indictment.

We note that if this were a case in which petitioner was charged by information, the prosecution would be entitled to file an information alleging "any offense or offenses shown by the evidence taken before the magistrate to have been committed" even if not found by the magistrate, so long as those offenses arose out of the same transaction which was a basis for a commitment. (§ 739; *People v. Jurado* (1992) 4 Cal.App.4th 1217, 1225–1226; *People v. Bartlett* (1967) 256 Cal.App.2d 787, 790–791.) The prosecution would also be entitled to seek an amendment so long as it did not "charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009.) Thus, in

11

assessing whether an information could assert a murder charge when the only theories that were applicable were direct aiding and abetting with malice, we would simply ask whether murder under that theory, whether found by the magistrate to have been committed or not, was shown by the evidence and was part of the same transaction as an offense charged in the original criminal complaint. A different rule should not apply when the defendant is committed by indictment, at least when a murder charge does not "change the offense" under section 1009.

We find some guidance in *People v. Caffero* (1989) 207 Cal.App.3d 678 (*Caffero*), in which the People appealed from an order granting the section 995 motion of two parents who had been charged with second degree murder and felony child abuse after their infant daughter died of an E. coli infection. The court agreed with the trial court that felony child abuse was not inherently dangerous to human life as was necessary for second-degree felony murder. (*Id*. at p. 681.) It then went on to consider whether there was sufficient evidence that the parents had acted with implied malice aforethought, and could be bound over for second degree murder under an implied-malice theory. (*Id*. at pp. 684–685.) Finding no evidence that the parents, though negligent, were aware that their failure to maintain good hygiene and seek timely medical care endangered their daughter's life, the court affirmed the order setting aside the information. (*Id.* at p. 686.)

Though *Caffero* came to the court of appeal in a different procedural posture (appeal from an order granting a section 995 motion setting aside the information), it is illustrative. The evidence presented at the preliminary hearing in that case supported a theory of murder that was legally invalid; the court went on to consider whether the evidence nevertheless supported a valid theory of murder. Because the evidence did not support such a theory, the section 995 motion was properly granted as to the murder charge. Implicit in the court's opinion is the assumption that if the evidence had supported a valid theory of murder, the case could have proceeded to a jury trial on that charge.

Moreover, petitioner assumes that under Senate Bill 1437, he cannot under any circumstances be convicted as an aider and abettor under either the natural and probable

12

consequences doctrine or the felony murder rule. But under the new law, an aider and abettor can still be convicted of first degree murder under a felony murder theory if the jury finds he was a major participant in an underlying robbery and acted with a reckless indifference to human life (§ 189, subd. (e)(3)). Petitioner suggests the grand jury specifically found he did not fall into this category when it rejected a special circumstance allegation under section 190.2, subdivision (a)(17), which required both elements. The instructions, however, allowed the grand jury to find the special circumstance true only if "the defendant's participation in the [robbery] began before or during the killing." The rejection of the special circumstance allegation may have been based on a failure to prove this element, rather than a failure to prove petitioner was a major participant or acted with reckless indifference to human life.

The evidence suggested that Simons first showed petitioner the victim's wallet when he approached petitioner's car, that the fatal shot was fired moments later, and that petitioner then fled the scene in his car with Herrera and Simons. The grand jury was instructed, "The crime of robbery continues until the perpetrators have actually reached a place of temporary safety." They might have concluded that while petitioner aided and abetted an ongoing robbery because Simons had not yet reached a place of temporary safety, his involvement in that crime did not begin until after the killing. We cannot say the grand jury necessarily found petitioner was not a major participant in the robbery and did not act with reckless indifference to human life, such that the issue should be precluded from being considered by the jury.

Petitioner relies on a line of cases holding that when the petit jury has been instructed on several theories of liability, and one of those theories is invalid, reversal is required absent a showing in the record that the error was harmless. (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129; see *People v. Aledamat* (2019)___Cal.5th___ [2019 WL 4009139].) He also relies on *In re Loza* (2018) 27 Cal.App.5th 797, 799, 801, in which the court granted the defendant's post-conviction petition for a writ of habeas corpus and reversed his first-degree murder conviction because it could not conclude beyond a reasonable doubt that the jury relied on a valid theory for first degree murder after the

13

Supreme Court held a defendant could not be convicted of that crime based on a natural and probable consequences theory.  (See *Chiu*, *supra*, 59 Cal.4th at p. 168.)  These authorities are inapposite because they involve a challenge to a conviction, at which the burden of proof—beyond a reasonable doubt—was much higher than the probable cause required to be shown for an indictment by the grand jury.  (See *People v. Leon* (2015) 61 Cal.4th 569, 596–597.)  Petitioner has not been convicted, and what is at stake here is whether there is sufficient evidence to allow a factfinder to hear the charges against him.  Any petit jury who hears petitioner's case may not be instructed on now-invalid theories of murder, but the enactment of Senate Bill 1437 does not mean that petitioner was indicted for that crime without probable cause.

## III.  DISPOSITION

The petition for writ of prohibition is denied.

_____
NEEDHAM, J.


We concur.



_____
JONES, P.J.



_____
SIMONS, J.


*Ortega v. Superior Court /* A156464

15

A156464 / Ortega v. Superior Court

Trial Court:   Superior Court of Contra Costa

Trial Judge:   Honorable Theresa Canepa,

Counsel:      Martinez Law Office, Martin James Martinez; Duane Morris, Michael Louis Fox; Elizabeth K. Barker and Zachary Nathan Linowitz, Deputy Public Defenders for Petitioner and Appellant.

No appearance for Respondent.

Xavier Becerra, Attorney General; Gerald A. Engler and Jeffrey M. Laurence, Assistant Attorneys General; Eric D. Share and Elizabeth W. Hereford, Deputy Attorneys General for Real Party in Interest.